FILED

2010 Apr-01  AM 11:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WATER WORKS BOARD OF THE CITY      }
OF BIRMINGHAM,                     }
                                   }
        Plaintiff,                 }      CIVIL ACTION NO.
                                   }      CV-09-AR-2296-S
v.                                 }
                                   }
AMBAC FINANCIAL GROUP, INC.,       }
and AMBAC ASSURANCE                }
CORPORATION,                       }

        Defendants.


**MEMORANDUM OPINION**

Before the court is the motion of defendants, Ambac Financial
Group, Inc., and Ambac Assurance Corporation (collectively
"Ambac"), to dismiss the amended complaint of plaintiff, Water
Works Board of the City of Birmingham ("the Board"), for failure to
state a claim upon which relief can be granted. Ambac's said Rule
12(b)(6) motion was orally argued on February 26, 2010. For the
reasons that follow, the motion will be granted, and the Board's
action will be dismissed with prejudice.

**PERTINENT ALLEGED FACTS[1]**

The Board is a public corporation that provides drinking water
to several Alabama counties. This action relates to the Board's

---

[1]     For purposes of a Rule 12(b)(6) motion, the court takes as true
the facts alleged in the complaint and draws all reasonable inferences in
plaintiffs' favor. *See Hardy v. Regions Mortgage, Inc.*, 449 F.3d 1357, 1359
(11th Cir. 2006). The complaint's allegations must plausibly suggest a right
to relief, raising that right "above the speculative level." *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). Mere "labels and
conclusions, and a formulaic recitation of the elements of a cause of action"
are insufficient. *Id.*

purchase of a surety bond (the "Surety Bond") from Ambac in March, 2007. The Board purchased the Surety Bond in connection with its issuance of over $300 million in water and sewer revenue bonds (the "Revenue Bonds"). How a **water** dispenser got into the **sewer** bond business is a question not asked or answered. The Surety Bond, which was negotiated at arms-length, provided that if the Board defaulted on any of the Revenue Bonds, Ambac would pay the principal and interest due the bond holders. To date, the Surety Bond is still in effect, and there is no evidence to suggest, and no allegation has been made, that if the Board defaults on the Revenue Bonds, Ambac will not comply with its contractual obligation. The Revenue Bonds are governed by a trust indenture (the "Trust Indenture"), entered into between the Board and the U.S. National Bank Association. Ambac participated in the negotiation and the drafting of the Trust Indenture, but was not a signatory. Under the Trust Indenture, the Board was required to establish and fund a Debt Service Reserve Fund (the "Reserve Fund") for the payment of the interest and principal on the Revenue Bonds. The Board could satisfy the requirements for creating the Reserve Fund in a number of ways, including a direct cash payment, a letter of credit, or the purchase of a surety bond. Under the terms of the Trust Indenture, if the Board elected to satisfy the Reserve Fund requirements through the purchase of a surety bond, the issuer of the bond had to have an investment grade credit rating of "AAA" by

Standard & Poor's ("S & P"), or "Aaa" by Moody's (collectively the "AAA rating"). The Trust Indenture provided that if the rating of the surety bond issuer should fall below AAA, the Board must either deposit in the Reserve Fund an amount of cash equal to the amount of all outstanding parity securities, or replace the original surety bond with another bond, letter of credit, or insurance policy from an issuer with a AAA rating.

At the time the Board and Ambac agreed upon the Surety Bond, and when the Board and the Trustee executed the Trust Indenture, Ambac was rated AAA by S & P and Aaa by Moody's. In June, 2008, S & P downgraded Ambac's rating to AA, and Moody's downgraded Ambac's rating to Aa3. As a result of these downgrades, the Board, as an alternative requirement under the Trust Indenture, made a cash deposit of over $15 million into the Reserve Fund. Whether it sought a substitute indemnifier with a AAA rating is not alleged. Whether any Ambac competition with a AAA rating existed at that time is also not alleged.

On November 10, 2009, the Board filed this action, alleging breach of contract, misrepresentation, deceit, suppression of truth, and negligence. On January 19, 2010, Ambac filed a motion to dismiss. On January 29, 2010, the Board amended its complaint, attempting to address the pleading inadequacies that had been pointed out by Ambac. On February 17, Ambac filed the current motion to dismiss the amended complaint.

3

**ANALYSIS**

**Breach of Contract**

To state a claim for breach of contract, the Board must plausibly allege that Ambac was under a contractual obligation, either express or implied, that Ambac breached its obligation, and that the Board suffered quantifiable damages as a result of the breach. *See Mahoney v. Loma Alta Prop. Owners Ass'n, Inc.*, 4 So. 3d 1130 (Ala. 2008); *Ex parte Jackson County Bd. of Ed.*, 4 So. 3d 1099 (Ala. 2008). The Board does not contend that there is an express provision in the Surety Bond requiring Ambac to maintain a specific credit rating. Rather, the Board's claim for breach of express contract rests on its argument that other documents, primarily the Trust Indenture, to which Ambac is not a signatory, are part of the overall contract between the Board and Ambac. (Pl.'s Br. in Opp'n. at 10). The Board would have the court join it in "deducing" that this amorphous and amalgamated "overall contract" somehow contains an "express" provision requiring Ambac to maintain a AAA rating as long as the bonds are outstanding. *Id*.

In support of the assertion that the Trust Indenture is part of the contract between the Board and Ambac, the Board argues that "[t]wo or more instruments that are executed contemporaneously by the same parties and dealing with the same subject matter constitute one contract." *Id.* (citing *Lloyd Nolan Foundation, Inc. v. Fairfield Healthcare Auth.*, 837 So. 2d 253 (Ala. 2002)). The

Board overlooks one of the basic premises of *Lloyd Nolan*, namely, that for two instruments to be considered one contract, they must be executed **by the same parties**. Ambac did not sign the Trust Indenture, and despite its participating in the negotiations leading to it and having certain rights under it, Ambac was not a party to it. The Trust Indenture cannot be considered part of the contract between the Board and Ambac. Provisions in the Trust Indenture do not bind Ambac, while they do bind the Board. They were designed that way. If they had constituted one contract the Board would be faced with the absolute defense of the Statute of Frauds contained in Ala. Code § 8-9-2(3), providing that any guarantee of the debt of another be in writing and signed by the guarantor.

Even if the Trust Indenture were to be considered part of the contract and not violative of the Statute of Frauds, the Board's claim for breach of express contract would fail, because like the Surety Bond, there is no language in the Trust Indenture saying what the Board claims, namely, that Ambac must "maintain its AAA rating as long as there were any of the 2007-A Bonds outstanding." (Am. Compl. ¶ 99). The Board claims to find such an express obligation in Article XI Sections 11.3 and 11.9 of the Trust Indenture. (Am. Compl. ¶ 12). These two subsections provide that **the Board** must maintain a reserve fund, and that if **the Board** chooses to purchase a surety bond to satisfy the Reserve Fund

requirement and if a bond issuer subsequently has its credit rating down-graded, **the Board** must replenish the Reserve Fund. (Am. Compl. Ex. B). Ambac is not mentioned by name in those parts of the Trust Indenture here relied upon by the Board. *Id.* While the Trust Indenture contains provisions that refer to Ambac as the issuer of the Surety Bond, the Board could have satisfied its Reserve Fund requirement in a number of ways when Ambac was downgraded, including the purchase of a surety bond from another insurer with a AAA rating, that is if one existed. *Id.* The facts that the Trust Indenture only refers to the insurer's credit rating in **the present tense**, and calls for specific actions to be taken by the Board if that credit rating should change in the future, demonstrates that the parties contemplated, and fully comprehended, that Ambac was not promising that its credit rating would not go down **in the future**.

It should also be noted that Ambac has no direct control over its credit ratings. While Ambac can operate in a way that it hopes will contribute to good credit ratings, S & P and Moody's make the credit ratings. It would defy logic and common sense for Ambac to obligate itself to maintain for thirty-five (35) years the highest possible credit rating, when the determination and award of credit ratings are by separate entities.

The Board's last gasp way to pursue a breach of contract claim is its assertion that the Surety Bond **implied** an obligation that

6

Ambac would maintain its AAA rating. The Board's argument in this respect relies on the presumption that the maintenance of a AAA rating was a "bargained for" benefit, although this benefit, critically important to the Board, was not included as an **express** condition in the contract. The Board and Ambac are sophisticated business entities. They both must be presumed to be familiar with this type of transaction. They negotiated the Surety Bond at arms-length. It is not plausible that they inadvertently failed to include such an important element, instead preferring to let the courts add it if and when a dispute over its implicit existence should arise. Because Ambac's having a AAA rating initially allowed the Board to use its capital in a way other than stocking the Reserve Fund, Ambac's having the highest possible rating when the Surety Bond was negotiated was an **immediate** benefit to the Board. But, when the Board bargained for and acquired that benefit, it knew or should have known that Ambac's credit rating could go down during the thirty-five (35) year life of the Revenue Bonds. If the Board had wanted to do so, it could have insisted upon a provision in the Surety Bond that if Ambac's rating was ever downgraded, Ambac would have to fulfill the mandatory Reserve Fund requirements. Alternatively, the Board could have negotiated for a provision that if Ambac's rating was ever downgraded, the Board could rescind the indemnity agreement and get its premiums back. The Board bargained for neither of these provisions, and

ostentatiously does not now seek a premium refund. In fact, the Board strangely sues Ambac for breach of contract while continuing to insist that Ambac perform the main provision of the contract, namely, the obligation to pay the bondholders if the Board defaults. The fact that the Board does not seek rescission for fraud in the inducement proves that the Board still expects to enforce the contract if and when it should become necessary. This court has never heard of a suit for breach of contract in which the complaining party still wants the breaching party to perform. There is, of course, always something new under the sun, but this court will not place its imprimatur upon such an unusual, if innovative, idea.  Had the Board insisted that the Surety Bond contain the provision it now wants the court to insert, it would certainly have had to give up something at the negotiating table, likely in the form of a much higher premium. More likely, Ambac would simply have declined to write such a Surety Bond. It would take an exorbitant premium to cover the guarantee of a perfect credit rating for thirty-five (35) years.

The Board did not bargain for, and did not obtain, a promise that Ambac will maintain a AAA credit rating, and the Board cannot ask the court to "imply" such simply because it has suffered financial harm that would have resulted from the breach of the contract that the Board **imagines,** but does not have. *See Melco Sys. v. Receivers of Trans-America Ins. Co.*, 268 Ala. 152, 158 (Ala.

1958).

Although the court finds that Ambac has not breached a contract, express or implied, *arguendo*, if there were any breach of contract, the Board would not be entitled to damages for the mental anguish its officials have undoubtedly suffered. Without seeking rescission, the Board claims damages in the sum of its entire premium payment. Such a request is facially improper, because at least part of the premium was to secure the stated purpose of the Surety Bond, namely, the guarantee to pay the bondholders in the event of the Board's default. Has the Board ever heard of the cake that can only be eaten under limited circumstances? As the most important provision of the contract is still in place, the Board cannot recover all premiums paid to Ambac. The Board's monetary loss, if any, is unquantifiable and so nebulous that its damages cannot be ascertained and its allegations respecting damages do not meet the pleading standards required by Rule 8(a), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, (2007), and *Ashcroft v. Iqbal*,---- U.S. ----, 129 S.Ct. 1937 (2009).

**Misrepresentation and Deceit**

The Board claims that Ambac misrepresented and/or withheld material facts concerning "the management of its underwriting and risk management" and its ability to maintain a AAA rating. (Am. Compl. ¶ 4). The Board specifically claims that Ambac overstated its underwriting standards and understated its risk of loss related

to its insurance of mortgage backed securities. (Am. Compl. ¶ 61).
To support this claim, the Board leans on a slender reed, namely,
Ambac's public press releases and financial reports, as well as
statements made by Sean T. Leonard, Ambac's CFO, during conference
telephone calls that involved people not in the employ of the
Board. (Am. Compl. ¶¶ 59-86).

As noted, the Board is not alone in seeking relief from Ambac
for losses resulting from Ambac's downgraded credit rating.   To
date, at least four other purchasers of surety bonds or other
financial guarantee instruments have sued Ambac for breach of
contract and/or fraud, based on many of the same public statements
here relied upon by the Board.[2] The first opinion in one of these
"sister" cases was issued on February 25, 2010, by the  District of
Massachusetts in *NPS LLC v. Ambac Assurance Corporation*, 2010 WL
723786, No. 08-11281 (D. Mass. Feb. 25, 2010). In *NPS*, the district
court, after thoroughly discussing other courts' treatments of
corporate statements such as those made by Ambac, dismissed the
misrepresentation claims, with the following holding:

> Here, of the statements that are alleged in the
> Complaint, some are simply not false (such as the
> statement that Ambac had over $11 billion in claims-
> paying resources). Others are general statements of
> opinion about the quality of services that Ambac would
> provide: that Ambac maintained a "high quality investment

---

[2]    *See Confederate Tribes of Warm Springs Reservation Oregon v. Ambac Assurance Corp.*, No. 10-00130 (D. Or. filed Feb. 5, 2010); *Baylor College of Medicine v. Ambac Fin. Group, Inc.*, No. H-09-3679 (S.D. Tex. filed Nov. 13, 2009); *City of New Orleans v. Ambac Assurance Corp.*, No. 08-3949 (E.D. La filed July 17, 2008).

portfolio," and a "strong and diversified portfolio of guaranteed obligations"; that Ambac had a "focus on comprehensive risk management"; and that Ambac's business model was conservative. These are representations of opinion because they either express only "the belief of the maker, without certainty, as to the existence of fact," or "his judgment as to quality, value, authenticity or other matters of judgment." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 21 (1st Cir. 2001)(quoting RESTATEMENT (SECOND) OF TORTS § 538A (1977)). There is no ascertainable standard by which to judge the truth of these statements. In other words, they are not "susceptible of actual knowledge" *Id.* at 22.

* * *

The only statements that approach the line separating fact and opinion are that Ambac guaranteed only those obligations that "are of investment grade quality with a remote risk of loss," and that Ambac was using its time-tested business model of stringent underwriting practices... Here, Ambac's alleged assertions about its "time-tested business model of stringent underwriting practices" and the "remote risk of loss" are not coupled with any specific statements of fact... Ambac's statements relating to risk management, diversification, and traditional methods of underwriting were "merely generalizations regarding [its] business practices," too general and vague to be capable of being proven true or false. *ECA, Local 134 IBEW Joint Pension Fund of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

*Id.* at 7-9.

The statements purportedly relied on by the Board are either the self-same statements analyzed by the court in *NPS* or are of a kind and character indistinguishable from them. (*See* Am. Compl. §§ 59-60; Pl.'s Br. in Opp'n. at 13). The Board has no way around *NPS* unless this court should decide that the reasoning of the *NPS* court is faulty. To the contrary, this court finds *NPS* very logical and

persuasive.[3] The Board elevates to statements of ultimate truth Ambac's obvious braggadocio: "We remain steadfast in judiciously allocating our capital"; and we are "very selective" and "very cautious" in assuming mortgage-related exposures. (Pl.'s Br. in Opp'n. at 13). The Board contends that these statements are actionable because "Defendants' rating, underwriting standards, portfolios and risk exposure are vitally important and material to the decision to do business with them." *Id.* It is undisputed that underwriting standards and risk exposure are material, perhaps even vital, to a decision of what surety to select. This court recognizes, as the court in *NPS* did, that some of Ambac's statements tread close to the line of being actionable. *See NPS*, 2010 WL 723786, at *6-10. However, this court, like the court in *NPS*, believes that although the complained of statements address important issues, they must, in order to form a basis for fraud, be statements **of fact**, capable of being proven true or false. Statements that an insurer is "very cautious" or has "rigorous

---

[3]      The Board cites *In re Ambac Financial Group, Inc. Litigation*, No. 08-411 (S.D.N.Y. filed Jan. 16, 2008), as a factually similar case in which a Rule 12(b)(6) motion was denied. *In re Ambac* is a securities fraud class action which does address many of the same statements by Ambac that the Board relies on. The court in *In re Ambac* held that Ambac's statements were more than mere puffery because "[a]lthough Ambac officers often spoke in general terms about the company's outlook, the defendants also made specific statements that Ambac's CDO portfolio was currently outperforming the market." *Id.* at 58. In *In re Ambac*, however, the "specific statements" that elevated Ambac's representations above puffery were made before the securities were purchased in that case, but after the Board purchased the Surety Bond. Therefore the Board could not have relied on such statements, puffery or not. *Id.* at 22. The Board is left only with non-actionable statements made in general terms.

underwriting standards" do not lend themselves to such proof. They may have been calculatedly designed to sell, while providing wiggle room to the seller. If such was Ambac's purpose, its statements were not unlike other puffing statements that are not actionable. They are too much akin to "we are the best in the business", or "we are just as good as AIG". They cannot form a basis for claiming misrepresentation or deceit. The Board's complaint, insofar as it contains these claims, will be dismissed. *See Wade v. Chase Manhattan Mortgage Corp.*, 994 F. Supp. 1369, 1380 (N.D. Ala. 1997).

Even if Ambac's statements were actionable, the Board's fraud claims would be subject to dismissal because the Board has failed adequately to plead the necessary element of **reliance.** "Reliance requires that the misrepresentation actually induced the injured party to change its course of action." *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 4 (Ala. 2004)(citing Restatement (Second) of Torts § 537 (1977)). The Board repeatedly cites statements made by Ambac to "the **public**", and claims that "[t]he **public** relied upon and responded favorably to Ambac's statements." (Am. Compl. ¶ 69)(emphasis added). The only non-public statements cited by the Board come from conference calls that the Board never directly alleges it was privy to. The Board never mentions any statements made by Ambac representatives **directly to it.** If there were such statements, the Board surely would have given the names of the persons who uttered them and heard them, and where and when they

13

were said, all necessary in order to meet the requirements of Rule 9(b). Aside from a bare conclusion that "The Water Works Board reasonably relied upon the false material representations of Ambac in purchasing the Surety Bond," the Board never tells Ambac or the court when and how it became aware of Ambac's public statements or how it came to rely upon them. Many of the statements upon which the Board "relies" were not even made until **after** the execution of the Surety Bond, and thus could not have been relied on as a basis for selecting Ambac. (*See* Am. Compl. ¶¶ 82-89).

**Suppression of Truth**

To plead a claim for suppression of truth, the plaintiff must allege "(1) a duty on the defendant to disclose a material fact; (2) the defendant's concealment or nondisclosure of that fact; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his injury." *Brushwitz v. Ezell*, 757 So. 2d 423, 431 (Ala. 2000). In commercial transactions, a party has no general obligation to disclose information, unless the party fails to respond to direct questions designed to elicit specific information. *Mason v. Chyrsler Corp.*, 653 So. 2d 951, 954-55 (Ala. 1995). The Board does not dispute that this Surety Bond was a commercial transaction negotiated at arms-length, nor does it claim that it made specific inquiries of Ambac that would have triggered a duty of disclosure. Rather, the Board argues that, "[t]he Defendants in voluntarily disclosing part of the truth surrounding

14

their financial condition, underwriting, surveillance and other matters set out in the Amended Complaint, had a duty to fully disclose the material facts of such matters." (Pl.'s Br. in Opp'n. at 26). The Board relies almost entirely on Ambac's public statements. If the Board's suppression argument is taken to its logical conclusion, it would mean that any time an entrepreneur issues a self-congratulating press release, it creates for itself the simultaneous duty to disclose **all** facts having any relevance whatsoever to the entrepreneur's overall business operations. It would follow that any party that wants to establish a commercial relationship with another party must, as a practical matter, not advertise unless its advertisement is watered down or rendered meaningless by a prominent disclaimer. A duty like the one the Board describes is not found in the law of Alabama. Because the Board has not established that Ambac owed it a duty of disclosure, the Board has failed to plead a *prima facie* case for suppression of truth. This inadequacy is not only an irreparable substantive failure, but the Board's complaint is also subject to Rule 12(b)(6) dismissal for non-compliance with the pleading requirements of Rule 9(b), of *Twombly*, and of *Iqbal*.

**Negligence**

The Board's negligence claim fails for one of the same reasons that its suppression claim fails, namely, the absence of factual allegations that would create a duty owed by Ambac to the Board.

15

The Board argues that "[i]f, there is no contract between the Water Works Board and the Defendants regarding this arrangement, then once the Defendants sold the Water Works Board the Surety Bond, they under took [sic] a duty to maintain their AAA rating during the time that any of the 2007-A bonds remained outstanding." (Pl.'s Br. in Opp'n. at 29). The Board is correct when it asserts that it is possible to allege a breach of contract, and, alternatively, to allege a tort that involves a breach of duty, but to do so the duty in tort must be independent of the duty in contract. *See Bishop's Prop. & Invs., LLC v. Protective Life Ins. Co.*, 597 F. Supp. 2d 1354, 1361 (M.D. Ga. 2009)(applying Alabama law). A contracting party cannot negligently breach its contract. He either breaches or does not breach. As the relationship between the Board and Ambac is purely contractual, it is impossible to conceive of Ambac's owing a duty to the Board outside the terms of the contract. If any such independent duty can be conceptualized, something this court is unable to do, the duty, to be actionable, must be one recognized by the law of Alabama. The Board offers nothing beyond its conclusory statement that Ambac had a duty to maintain its AAA rating so that when it failed to do so it committed a tort. The Board cites no case law, and can cite none, in which such a duty is imposed. The pleadings must plausibly state a claim that a duty existed if the Board's negligence claim is to survive a Rule 12(b)(6) motion.

16

**CONCLUSION**

When a recession occurs, only the lucky few or the prescient who can see the future are the ones who avoid or minimize the loss that the unlucky and/or unwary suffer. It can be said with relative certainty that most entities that have been negatively affected by the present downturn are not happy about it. Ambac is undoubtedly unhappy about its own sliding credit-rating, if for no other reason than that there have been a deluge of lawsuits against it. The Board, adversely, if indirectly, impacted by Ambac's downgrade, is also unhappy. However, because there has been no violation of law by Ambac, the unhappy Board cannot seek redress in this court. The Board is just as sophisticated as Ambac is. It negotiated a contract at arms-length. The Board ostensibly had knowledge of the relevant facts and was aware of the obvious possibility that Ambac might, in the next thirty-five (35) years, have its credit rating downgraded. Neither party apparently was Nostradamus. The fact that the separate Trust Indenture recognized that Ambac **presently** had a AAA rating implies, and potentially proves, that the parties contemplated the possibility of a **subsequent** downgrade. When the Surety Bond and the Trust Indenture were negotiated, all parties were undoubtedly well lawyered-up. They could not have missed the significance of the absence of a guarantee of a AAA rating for thirty-five (35) years. Ostensibly armed with all information that it had demanded of Ambac, and not demanding the promise that it now

17

wants this court to pull out of the hat, the Board either gambled that Ambac would maintain its high credit rating throughout the life of the Revenue Bonds, or was not as well lawyered as it thought it was. The Board cannot ask this court to fabricate a contractual obligation that is conspicuous by its absence.

The Board may be learning a hard lesson in the expensive school of hard knocks, but all it can expect from this court is sympathy, hope for a bail out, and a question: "If Ambac gets its AAA rating back, can the Board retrieve the $15 million it has paid into the Reserve Fund?"

A separate order of dismissal will be entered.

DONE this 1st day of April, 2010.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE